No. 121,125

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CITY OF WICHITA,
*Appellee*,

v.

ARLANDO TROTTER,
*Appellant*.

SYLLABUS BY THE COURT

1.

A challenged regulatory framework comes before the court cloaked in a presumption of constitutionality. This means that appellate courts presume statutes and ordinances are constitutional and must resolve all doubts in favor of their validity. The party asserting a constitutional claim must prove the law clearly violates the Constitution.

2.

Whether an ordinance violates the Constitution presents a question of law over which an appellate court exercises plenary review.

3.

The First Amendment to the United States Constitution prohibits governments from passing laws that impermissibly abridge the freedom of speech. Although the Constitution only references "speech," courts have interpreted the First Amendment broadly to apply to freedom of expression, including musical and other artistic expression.

1

4.

Governmental restrictions that do not regulate the content of expression but instead govern the time, place, and manner that expression may occur will be upheld if they are justified without reference to the content of the regulated speech, are narrowly tailored to serve a significant governmental interest, and leave open ample channels for communication of the expression.

5.

Although time-place-and-manner regulations must be narrowly tailored to serve a significant governmental interest, narrow tailoring in this context does not demand that a regulation be the least restrictive or least intrusive means of achieving the government's end. Instead, such a regulation will stand if it promotes a substantial government interest that would be achieved less effectively absent the regulation.

6.

When a government imposes a content-neutral licensing framework that preemptively impacts the time, place, and manner of free expression, it must satisfy two additional criteria. First, there must be narrowly drawn, reasonable, and definite standards to guide the licensor's discretion in granting or denying a license. And second, there must be a reasonable and meaningful framework for appealing any adverse determination.

7.

The proscription against vague directives is rooted in the Due Process Clause of the Fourteenth Amendment to the United States Constitution and in separation-of-powers principles. To survive a vagueness challenge, a law must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

8.

An ordinance is constitutionally overbroad if it makes conduct punishable that under some circumstances is constitutionally protected from criminal sanctions. Because almost every law is potentially applicable to constitutionally protected acts, a successful challenge based on overbreadth can be made only when (1) the protected activity is a significant part of the law's target and (2) there exists no satisfactory method of severing that law's constitutional from its unconstitutional applications.

9.

Municipalities have broad police powers to enact ordinances regulating or restricting certain activities to promote the health, safety, and welfare of the public. An exercise of the police power is valid if it bears a real and substantial relation to the public health, safety, morals, or general welfare of the public and is not unreasonable or arbitrary.

10.

When a defendant challenges the sufficiency of the evidence in a criminal case, appellate courts review the entire record in a light most favorable to the charging authority to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. For the evidence to be sufficient, there must be some evidence supporting each element of the crime.

11.

Prosecutors are not permitted to misstate the law. But a prosecutor may discuss the contours of contested facts and apply those facts to the law provided in the district court's instructions to the jury.

12.

An appellate court reviews a district court's response to a mid-deliberation question by the jury for an abuse of discretion and only finds error when no reasonable person would agree with the district court's position.

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed September 25, 2020. Affirmed.

*Kevin J. Zolotor*, of O'Hara & O'Hara LLC, of Wichita, for appellant.

*Jan Jarman*, assistant city attorney, and *Jennifer Magana*, city attorney, for appellee.

Before WARNER, P.J., MALONE and BRUNS, JJ.

WARNER, J.: The First Amendment to the United States Constitution prohibits the government from abridging our freedom of expression. But that freedom is not absolute. In particular, courts have long recognized that as long as the government does not tell us *what* we can or cannot say, it may nevertheless regulate *when*, *where*, and *how* our expression may occur. That is, if the government satisfies certain safeguards inherent in the Constitution, it may impose content-neutral restrictions limiting the time, place, and manner in which our speech can take place.

This case provides a concrete illustration of these principles. The City of Wichita has adopted an ordinance requiring anyone who wishes to operate an "entertainment establishment" to first obtain a license from the City. These licensing requirements are triggered by someone's decision to provide entertainment to the public, though they do not govern the content of the entertainment a person may provide. Anyone with a license must comply with restrictions based on noise level, hours of operation, building capacity, safety, and security.

4

A Wichita jury found Arlando Trotter had violated these provisions by operating an unlicensed club. On appeal, he challenges the constitutionality of Wichita's licensing framework, claiming it impermissibly restricts his expressive conduct and requires governmental approval before he may engage in that expression. We find the ordinance to be a permissible restriction on the time, place, and manner in which people may offer entertainment to the public. After carefully reviewing the parties' constitutional arguments and Trotter's additional claims, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The Wichita Municipal Code requires anyone who wishes to operate an "entertainment establishment"—that is, a person or entity that provides entertainment (or a venue for entertainment)—to first obtain a license from the City. Wichita Municipal Ordinance (W.M.O.) 3.30.020; W.M.O. 3.30.030. The Code defines "entertainment" as including "any single event, a series of events, or an ongoing activity or business, . . . to which the public is invited or allowed to watch, listen, or participate, or is conducted for the purposes of holding the attention of, gaining the attention of, or diverting or amusing patrons." W.M.O. 3.30.020. It also lists a number of activities covered by this provision, such as dancing to live or recorded music, playing music provided by a disc jockey (DJ), and presenting live music or other live performances. See W.M.O. 3.30.020.

Though an establishment must obtain a license to provide this entertainment, the Code does not "regulate or restrict the type or content" of the entertainment provided. W.M.O. 3.30.010. In other words, it does not require certain music to be played or ban other artistic expression. Instead, the Code regulates establishments generally, requiring them to meet certain capacity specifications and to comply with laws regarding security, controlled substances, alcohol, activities that constitute a public nuisance, and noise levels. See W.M.O. 3.30.120; W.M.O. 3.30.150; W.M.O. 3.30.160. In certain parts of the City, the Code requires that establishments must close by 2 a.m. W.M.O. 3.30.070(b).

5

The Code indicates that the City adopted this licensing framework to combat a host of public safety and nuisance issues common to nightclubs and entertainment establishments—among other things, "public intoxication, public urination, noise, disorderly conduct, assaults, and other similar problems connected primarily with the routine congregation of persons around . . . nightclubs, especially those . . . managed without adequate security and attention to preventing these problems." W.M.O. 3.30.010. The Code observes that, before the framework was adopted, entertainment establishments where alcohol was served had sometimes "creat[ed] an environment where various types of disturbances, excessive noise[,] and disorderly conduct by inebriated patrons may occur." W.M.O. 3.30.010. In Wichita's Old Town district in particular, "a significant amount of police resources" were being devoted to "safety issues" at these venues. W.M.O. 3.30.010. The licensing system sought to "minimize the[se] negative effects and to preserve the public safety, health[,] and welfare." W.M.O. 3.30.010.

Any person who violates Wichita's licensing framework—including, most fundamentally, by operating an entertainment establishment without a license—is guilty of a misdemeanor and subject to a fine. W.M.O. 3.30.190(a). This brings us to the particular facts of Trotter's case.

In 2017, Wichita police suspected a building was being used as an after-hours club—that is, an *unlicensed* entertainment establishment. Police observed a handful of people, presumably employees, arrive at the club around 11:00 p.m. Patrons would arrive between 1:00 a.m. and 2:00 a.m. People lined up behind a velvet rope at the front door where a security guard would scan people with a security wand before letting them enter. On one night, police estimated 200 people were either inside or waiting to enter the club.

After several attempts, police contacted Trotter, who identified himself as the club's owner. Trotter told the police he ran a private membership organization, which

6

operated on donations and the $800 yearly fee paid by each of its 200 members. He explained the club did not have a drinking or entertainment establishment license, and the club did not serve alcohol. Trotter appeared reluctant to let police inspect the club.

Police continued to investigate. They learned the establishment had gone by several names—including Club Daiquiri and Club Mystique—over the years. Club Mystique had a valid entertainment-establishment license, but Trotter was not associated with that club. Researching online, officers found a Facebook post announcing that a new after-hours club—called The Association—had opened at that same address. And during subsequent observations of the club, police heard music being played from inside.

Officers obtained a search warrant, which they executed one evening before patrons began to arrive. They could hear music playing from inside as they approached the building. The officers entered the club, announced they had a search warrant, and asked that the music be turned down. They found nine people in the establishment, all presumed to be employees, and a person in a booth who identified himself as the DJ.

The officers described the club as having a dance floor, a bar, a kitchen, and a cordoned-off section. The DJ booth contained music equipment, and other parts of the club contained several 3-foot-tall speakers, flashing lights, and a projector screen. The front vestibule contained a table with two pieces of paper. One, written on lined notebook paper, stated entrants had to pay a $10 membership fee; the other listed the club's name and the date, and contained lines where entrants could write their name, phone number, and e-mail address.

Police searched the premises, finding music equipment and several bottles of alcohol. They also collected $260 in cash, though they did not find a cash register or credit card machines. At some point, Trotter arrived and spoke with the officers. The officers explained what they were doing and showed him a copy of the search warrant.

7

The City charged Trotter with operating the club without a liquor license and without an entertainment-establishment license. A Wichita municipal court found him guilty on the entertainment-establishment charge but acquitted him of operating without a liquor license. Trotter then appealed his conviction to district court.

Before trial, Trotter filed a motion to dismiss, asserting the entertainment-establishment ordinance was unconstitutionally vague and overbroad. He also claimed the ordinance was invalid because it was a prior restraint on his right to freedom of speech under the First Amendment to the United States Constitution.

The district court denied the motion. It held the ordinance gave sufficient warning of the prohibited activities and was therefore neither vague nor ambiguous. And it found the ordinance was not overbroad because it does not regulate the type of music played, and the City has a valid interest in safeguarding the public. Finally, the court ruled the ordinance does not violate the First Amendment. The court emphasized that the licensing framework seeks to regulate—not ban—music, and the ordinance provides detailed licensing and appeal criteria.

The case proceeded to trial, where a jury convicted Trotter of operating an entertainment establishment without a license. The court imposed a $1,500 fine and ordered Trotter to pay court costs. Trotter appeals.

DISCUSSION

Trotter contests his conviction in two ways. *First*, he renews his constitutional challenges to Wichita's entertainment-establishment licensure, claiming the provisions infringe his right to freedom of expression under the First Amendment; he also claims the provisions are vague, overbroad, and subject licensees to unreasonable restrictions.

8

*Second*, he asserts that various aspects of his jury trial require reversal. We address each category of Trotter's claims in turn.

1. *Trotter has not shown Wichita's licensing framework for entertainment establishments violates the United States Constitution.*

Trotter's primary argument on appeal is that Wichita's entertainment-establishment licensing framework is an impermissible restraint on his freedom of expression under the First Amendment. But this is not his only constitutional challenge. He also argues the framework is impermissibly vague in its definition of entertainment, leading to questions regarding what conduct must be licensed. And he argues the framework is overbroad, casting a wider net than necessary in order to achieve its policy goals. Finally, Trotter alleges that the framework's inspection provisions are impermissible in that they require licensees to forego their Fourth Amendment right to be free from unreasonable searches.

Our constitutional analysis begins with the recognition that a challenged regulatory framework "comes before the court cloaked in a presumption of constitutionality." *Leiker v. Gafford*, 245 Kan. 325, 364, 778 P.2d 823 (1989). This means that appellate courts presume statutes and ordinances are constitutional and must resolve all doubts in favor of their validity. *State v. Petersen-Beard*, 304 Kan. 192, 194, 377 P.3d 1127, *cert. denied* 137 S. Ct. 226 (2016). The party asserting a constitutional claim must prove the law clearly violates the Constitution. *Leiker*, 245 Kan. at 364. Whether an ordinance violates the Constitution presents a question of law over which we exercise plenary review. See *City of Wichita v. Hackett*, 275 Kan. 848, 853, 69 P.3d 621 (2003); *Huffman v. City of Maize*, 54 Kan. App. 2d 693, 697, 404 P.3d 345 (2017).

Before addressing the merits of Trotter's constitutional claims, it is helpful to provide some background on the contours of the licensing framework he challenges. As a starting point, the Code makes it "unlawful for any person . . . to own, lease, manage, maintain or operate a[n] . . . entertainment establishment without having first obtained a

9

license from the City Treasurer." W.M.O. 3.30.030.A. When seeking a license, an applicant must include various items outlined in W.M.O. 3.30.080, such as:

- Information relating to the applicant's identity and the identity of the owners, managers, and operators of the proposed establishment. W.M.O. 3.30.080(a)(1), (b)(1), (b)(2), (b)(3), (b)(9).

- Information regarding the operation of the entertainment establishment, including its location and maximum occupant load, along with plans and drawings; its proposed hours and days of operation; a description of the entertainment that will be provided; and a statement as to whether alcohol will be sold on the premises. W.M.O. 3.30.080(a)(2), (a)(4), (a)(5), (a)(7), (a)(8), (b)(8).

- Information relating to the safety of patrons and the public, including a plan regarding "adequate traffic control, crowd protection[,] and security"; an "emergency management plan"; a "written safety plan"; and the name of any private security agency that the establishment intends to employ. W.M.O. 3.30.080(b)(4), (b)(5), (b)(6), (b)(7). Applicants must also consent to the establishment's inspection by the police or fire departments, or other Code enforcement or health officials. W.M.O. 3.30.080(b)(10); W.M.O. 3.30.130.

The Code sets forth seven situations that will lead to an application's denial, ranging from an applicant's criminal background to failure to comply with health or zoning codes. W.M.O. 3.30.080(c). And it includes an enumerated list of safety reasons an entertainment-establishment license may be suspended, revoked, or denied. W.M.O. 3.30.090. Additionally, the City may suspend a license when the "conduct by disorderly patrons reaches a magnitude that presents an immediate threat to the public safety and well-being of the patrons and general public in the vicinity of the establishment." W.M.O. 3.30.095(a).

The Code also provides a procedure through which an applicant or licensee may challenge a license denial, suspension, or other unfavorable decision. Within 10 business days of the adverse action, the aggrieved party may appeal any administrative decision to the Wichita City Council. W.M.O. 3.30.100(a). When such an appeal is filed, the City Clerk must schedule a hearing before the City Council within 30 days. W.M.O. 3.30.100(b). If the party is unhappy with the City Council's determination, he or she may then appeal that decision to the Sedgwick County District Court. W.M.O. 3.30.100(e).

Our review of this framework reveals at least three important observations. *First*, Wichita's licensing requirements do not apply to all establishments; instead, they are triggered by a person's or venue's desire to provide some form of "entertainment" to the public. *Second*, an establishment must be granted a license under the Code before it may offer the covered forms of entertainment; failure to do so is unlawful and may, as Trotter discovered, result in prosecution. And *third*, although Wichita's licensing requirements apply generally to persons or venues offering entertainment, nothing in the licensing framework allows the City to deny, suspend, or revoke a license based on the content of the entertainment to be offered.

With this background, we turn to Trotter's constitutional challenges.

1.1. *The licensing framework does not violate the freedom of expression protected by the First Amendment.*

The First Amendment prohibits governments from passing laws that abridge the freedom of speech. U.S. Const. amend. I. At its core, the First Amendment aims "to protect expression that engages in some fashion in public dialogue, that is "'communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to

take action on the basis of one's beliefs.'"" *State v. Whitesell*, 270 Kan. 259, 271, 13 P.3d 887 (2000).

Although the Constitution only references "speech," courts have interpreted the First Amendment broadly to apply to freedom of expression. This "means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002). And expression encompasses music— "one of the oldest forms of human expression"—and other artistic endeavors. *Ward v. Rock Against Racism*, 491 U.S. 781, 790, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989).

The freedom to express oneself through speech, music, art, or other media is one of the most fundamental tenets of our republic. But it is not absolute. See *State v. Russell*, 227 Kan. 897, 899-900, 610 P.2d 1122, *cert. denied* 449 U.S. 983 (1980). Rather, because First Amendment jurisprudence rests at the intersection of the State's police power and individuals' personal freedoms, courts employ a "careful weighing and balancing of the respective interests" to determine whether a government's attempted regulation of expression is permissible. 227 Kan. at 901. And we employ varying degrees of scrutiny to evaluate the challenged governmental action, depending on the nature of the encroachment on free expression and the governmental interest at stake. See *Whitesell*, 270 Kan. 259, Syl. ¶ 7 ("As speech strays further from the values of persuasion, dialogue, and free exchange of ideas, . . . the State has greater latitude to regulate expression.").

Multiple factors affect courts' analyses in this arena, including the "*manner* and *time* of [the] regulation" in question. (Emphases added.) *Russell*, 227 Kan. at 900. As to *manner*, governmental actions that directly regulate the content of speech are treated with greater skepticism than those that only peripherally implicate expression (without regard to the sentiments expressed):

- Restrictions based on speech's content, which "have the constant potential to be a repressive force in the lives and thoughts of a free people," are "presumed invalid" and subject to strict scrutiny by courts. *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 660, 124 S. Ct. 2783, 159 L. Ed. 2d 690 (2004). Such restrictions may be upheld only when the government proves they are "'necessary to serve a compelling state interest" and "narrowly drawn to achieve that interest.'" *Lower v. Board of Directors of Haskell County Cemetery Dist.*, 274 Kan. 735, 745, 56 P.3d 235 (2002) (quoting *Griffin v. Secretary of Veterans Affairs*, 288 F.3d 1309, 1321 [D.C. Cir. 2002]).

- Content-neutral restrictions that incidentally regulate both expressive and nonexpressive conduct are subject to less exacting review. These restrictions will be upheld if (1) the regulation is "within the [government's] constitutional power," (2) the regulation "furthers an important or substantial governmental interest," (3) the governmental interest is "unrelated to the suppression of free expression," and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968).

As a further refinement of the principles discussed in *O'Brien*, restrictions that do not regulate the content of expression—i.e., *what* may be expressed—but instead direct *how*, *where*, and *when* that expression can take place are also subject to less intense scrutiny by courts. See *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 298 n.8, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984). These regulations, commonly called "time, place, or manner" restrictions, will be upheld if they are "justified without reference to the content of the regulated speech," are "narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels for communication of the information." 468 U.S. at 293.

Although time-place-and-manner regulations must be "narrowly tailored" to serve a governmental interest, narrow tailoring in this context does not demand that a regulation be the "least restrictive or least intrusive means" of achieving the government's end. *Ward*, 491 U.S. at 798. Instead, such a regulation will stand if it "'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S. Ct. 2897, 86 L. Ed. 2d 536 [1985]).

Courts' analyses of challenged regulations are also colored by the *timing* of the governmental action. That is, does the law impose consequences on speech after that speech has already occurred (and thus entered the public sphere)? Or does it condition a person's ability to speak on prior governmental authorization? Not surprisingly, history looks with a jaundiced eye on governmental efforts to require prior approval of speech's content before it may be expressed. Such laws—or "prior restraints"—"'present[] peculiar dangers to constitutionally protected speech,'" as they provide the greatest potential for chilling expression. *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 321, 122 S. Ct. 775, 151 L. Ed. 2d 783 (2002) (quoting *Freedman v. Maryland*, 380 U.S. 51, 57, 85 S. Ct. 734, 13 L. Ed. 2d 649 [1965]). And they therefore "'bear[] a heavy presumption against [their] validity.'" *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990) (O'Connor, J., plurality) (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S. Ct. 1239, 43 L. Ed. 2d 448 [1975]); see, e.g., *Freedman*, 380 U.S. 51 (striking down a law requiring prior approval by governmental movie censors before a film could be shown to the public).

But not all prior restraints are content-based regulations of speech. Some licensing frameworks aimed at addressing other concerns may incidentally touch on speech or other expression. See, e.g., *City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 783, 124 S. Ct. 2219, 159 L. Ed. 2d 84 (2004) (upholding city's licensing framework for adult

14

businesses when the framework is based on neutral criteria and only incidentally relates to the expressive choices of the regulated businesses); *Thomas*, 534 U.S. at 322-25 (upholding municipal ordinance requiring a permit before someone may hold large-scale events at a city park); *Ward*, 491 U.S. at 782 (upholding permitting system aimed at governing noise levels and hours of operation for concerts at a city bandshell).

Content-neutral prior restraints are "not subject to the presumption of invalidity that attaches to the 'direct censorship of particular expressive material.'" *City of Littleton*, 541 U.S. at 785 (Stevens, J., concurring) (quoting *FW/PBS, Inc.*, 493 U.S. at 229). Indeed, the United States Supreme Court has "never required that a content-neutral permit scheme regulating speech . . . adhere to the procedural requirements" governing content-based prior restraints. *Thomas*, 534 U.S. at 322. This is because content-neutral regulations "that ensure the safety and convenience of the people are not 'inconsistent with civil liberties but . . . [are] one of the means of safeguarding the good order upon which [civil liberties] ultimately depend.'" 534 U.S. at 323 (quoting *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S. Ct. 762, 85 L. Ed. 1049 [1941]).

Yet "even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression." *Thomas*, 534 U.S. at 323. This is particularly the case when a "licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit." 534 U.S. at 323. Thus, when a government imposes a content-neutral licensing framework that preemptively impacts the time, place, and manner of free expression, it must satisfy two criteria in addition to other time-place-and-manner restrictions. *First*, there must be "'narrowly drawn, reasonable and definite standards' to guide the licensor's" discretion in granting or denying a license. 534 U.S. at 324. And *second*, there must be a reasonable and meaningful framework for appealing any adverse determination. 534 U.S. at 324.

With these principles in mind, we turn to Trotter's claims. He argues that his decision to provide "entertainment"—here, music mixed by a DJ—for his patrons at his business is a form of expression protected by the First Amendment. And he argues that requiring him to apply for and receive a license before he engages in that expression acts as an impermissible prior restraint on his ability to engage in expressive conduct.

As a preliminary matter, we agree with Trotter and the district court that Wichita's entertainment-establishment licensing framework implicates Trotter's freedom of expression. See *Ward*, 491 U.S. at 790. The licensing requirement is triggered only when a person or entity seeks to offer entertainment to the public, and the Code defines "entertainment" to include instances of musical and other artistic expression. See W.M.O. 3.30.020. Because Wichita's licensing requirements intersect with licensees' freedom of expression, this case does not—as the City argues—solely present a question about the scope of the City's police power. Thus, we must evaluate the licensing framework within the context of our First Amendment jurisprudence.

But the fact that Wichita's licensing framework intersects expressive conduct does not mean, as Trotter asserts, that we analyze those provisions under the exacting scrutiny applicable to censorship schemes or other content-based restrictions. Although the requirement that a business have an entertainment-establishment license is triggered by the decision to provide entertainment, the Code does not "regulate or restrict the type or content" of the entertainment a licensed entity can provide. W.M.O. 3.30.010. The Code provides the City no discretion to deny, suspend, or take any other adverse action on a license based on the type of entertainment offered. And the purposes served by the license—such as reduction in noise levels and disorderly conduct, regulating operating hours, and ensuring the venues comply with certain capacity and safety requirements— are unrelated to the entertainment a club offers. See *Ward*, 491 U.S. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.").

16

Because "[n]one of the grounds for denying a permit has anything to do with what a speaker might say," Wichita's entertainment-establishment licensing framework is a content-neutral, time-place-and-manner restriction. *Thomas*, 534 U.S. at 322. We must therefore determine whether the licensing requirement promotes a substantial government interest that would be achieved less effectively absent the regulation and whether it leaves open ample channels of entertainment for the public. See *Ward*, 491 U.S. at 799; *Clark*, 468 U.S. at 293. Moreover, because someone must obtain a license before offering his or her intended entertainment, we must also consider whether there are reasonable and definite standards to guide the licensor's determination, as well as a reasonable and meaningful framework to appeal the City's decisions. See *Thomas*, 534 U.S. at 324.

We conclude the licensing framework satisfies these safeguards. First, we have no difficulty concluding that the Code promotes a substantial government interest in addressing the City's concerns regarding noise levels, operating hours, safety, and security and that these concerns would be furthered less effectively without these regulations. Trotter's club underscores this reality; at trial, the City presented evidence that around 200 patrons arrived at the establishment late at night (between 1 a.m. and 2 a.m.) and either entered the club or lined up outside the door. And the DJ's music could be heard outside the premises. Trotter did not have—nor, according to the municipal judge's findings, need—a liquor license. Without the entertainment-establishment licensing requirement, the City's ability to safeguard the club or regulate its conduct for the safety of patrons, the public, and the neighborhood would be diminished.

Second, the Code leaves open ample alternative channels of providing entertainment. Though Trotter attempted to analogize his claim before the district court as the practical realization of the prohibition against dancing depicted in the movie *Footloose* (Paramount Pictures 1984), entertainment is not banned within Wichita. Instead, one must apply for a license. Thus, Wichita "continues to permit expressive

activity" and its regulations have "no effect on the quantity or content of that expression" beyond the mere fact of its licensing framework. See *Ward*, 491 U.S. at 802. Trotter has not demonstrated that the remaining avenues of expression are inadequate.

And third, the licensing framework provides meaningful standards that govern the City's decision to deny or suspend a license, as well as an appeal process for challenging an adverse decision—both before the City Council and in the district court. See W.M.O. 3.30.080(c) (listing the seven reasons why the City may deny a license); W.M.O. 3.30.090 (listing reasons why the City may suspend, revoke, or deny a license); W.M.O 3.30.095(a) (immediate suspension due to immediate threat to public safety); W.M.O. 3.30.100 (appeal procedure). In this way, Trotter's reliance on *Jersey's All-American Sports Bar, Inc. v. Washington State Liquor Control Board*, 55 F. Supp. 2d 1131 (W.D. Wash. 1999), is misplaced. *Jersey's*—which was decided three years before *Thomas* clarified the standard for content-neutral prior restraints—involved a Washington law that prohibited the holder of a retailer's permit to allow music, dancing, or entertainment on the premises without obtaining prior approval (a liquor license). But the government there had not published standards to guide its officials' discretion in issuing a license. Thus, the regulations challenged in *Jersey's*, though at first blush similar to the Wichita framework, are meaningfully distinguishable from the ordinances challenged here.

Trotter also argues the Code's requirements concerning a license denial inject discretion into the process, as the Code only states who *may not* receive a license instead of who *must* receive a license. But we have a duty to construe the ordinance as constitutional and do not believe the Code requires such a reading. See *Petersen-Beard*, 304 Kan. at 194. The Code contains definite criteria governing when an application for a license may be denied—the reasonable inference is that applications that do not fall into those defined categories will be granted a license.

18

Given these constraints on the City's discretion and the Code's established appeal procedure, the licensing requirement is a permissible prior restraint on the time, place, and manner of the expression it incidentally regulates. Wichita's licensing framework does not impermissibly infringe Trotter's free expression under the First Amendment.

1.2. *The licensing framework is not unconstitutionally vague or overbroad.*

Trotter also asserts that Wichita's licensing framework is unconstitutionally vague and overbroad. Trotter argues that Wichita's Code does not clearly delineate *who* must obtain a license. He asserts that the term "establishment" usually describes a building or structure and that Wichita's framework is confusing because it applies to locations and persons (whether individuals or entities). And he claims that this confusion is amplified because the Code provides a nonexhaustive list of examples of covered entertainment. He also points to the Code's purpose section, which references the dangers of unlicensed clubs serving alcohol, but notes that the licensing requirements apply regardless of whether alcohol is served. The result of this combination, he argues, is that people are not placed on notice of who must obtain a license or what a person needs a license for— rendering the licensing requirement unconstitutionally vague. And he claims that this uncertainty has the potential to discourage people from engaging in conduct that is not covered by the ordinances—rendering the framework overbroad.

Vagueness and overbreadth, though closely related principles, are distinct in their protections. *State v. Huffman*, 228 Kan. 186, 189, 612 P.2d 630 (1980). The proscription against vague directives is rooted in the Due Process Clause of the Fourteenth Amendment to the United States Constitution and in separation-of-powers principles. *State v. Harris*, 311 Kan. ___, ___, 467 P.3d 504, 507 (2020). A vague law "leaves persons of common intelligence to guess at its meaning and whether particular conduct is a crime." *Huffman*, 228 Kan. at 189. To survive a vagueness challenge, a law must "define the criminal offense with sufficient definiteness that ordinary people can

understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983).

While vagueness incorporates due-process principles of notice and fairness, questions of overbreadth are largely limited to regulations that impinge on First Amendment rights. *Hearn v. City of Overland Park*, 244 Kan. 638, 645, 772 P.2d 758 (1989). An overbroad ordinance "makes conduct punishable which under some circumstances is constitutionally protected from criminal sanctions." *Huffman*, 228 Kan. at 189. "Obviously, almost every law is potentially applicable to constitutionally protected acts." *State ex rel. Murray v. Palmgren*, 231 Kan. 524, 533, 646 P.2d 1091 (1982). Thus, a successful overbreadth challenge can be made only when "(1) the protected activity is a significant part of the law's target, and (2) there exists no satisfactory method of severing that law's constitutional from its unconstitutional applications." *Whitesell*, 270 Kan. 259, Syl. ¶ 6.

We agree with the district court that Wichita's licensing framework is neither impermissibly vague nor overbroad. The Code unambiguously defines "entertainment" as an event (or series of events) or an ongoing activity of a business where the public is invited or allowed to "watch, listen, or participate" or is offered to "gain[] the attention of, or divert[] or amus[e] patrons." W.M.O. 3.30.020. This includes dancing, live or mixed music (such as by a DJ), and other performances. An "entertainment establishment" is merely a person, entity, or event center that offers such entertainment. The Code also clarifies a number of activities that do not fall within the licensing requirements, such as entertainment offered in private residences, schools, dance lessons, and ambient or incidental music at restaurants. W.M.O. 3.30.050(a), (b), (e), (l). Contrary to Trotter's arguments, the Code provides adequate notice to the public and to enforcing officials as to who must obtain a license. And the entertainment offered by Trotter's club—music being mixed and played by a DJ—was clearly within the reach of the Wichita ordinance.

20

See W.M.O. 3.30.020(b) (noting entertainment includes the "presentation of music played on sound equipment operated by . . . [a] 'DJ'"). He has not shown Wichita's licensing framework is impermissibly vague, either on its face or as applied to him.

Trotter's overbreadth challenge similarly fails. As we have previously discussed, the First Amendment's prohibition against governmental interference with free expression, though broad, is not unbounded. People do not have an absolute right to provide entertainment to the public. Wichita's licensing framework does not bar people from engaging in expressive activity. Nor does it seek to regulate the type of entertainment provided in clubs or other establishments. It merely requires businesses and events to obtain a license and comply with various regulations regarding capacity, noise levels, and security. And we have concluded that this licensing requirement, though it peripherally implicates free expression, does not violate the First Amendment. Given these realities, we do not believe that the licensing provisions impermissibly punish protected speech or run the risk of discouraging people from providing expressive entertainment. The license requirement is not overbroad.

Lastly, we note that overbreadth is a legal term of art used in the First Amendment context. See *Schall v. Martin*, 467 U.S. 253, 268 n.18, 104 S. Ct. 2403, 81 L. Ed. 2d 207 (1984) ("outside the limited First Amendment context, a criminal statute may not be attacked as overbroad"). Despite the parties' discussion in their briefs, Trotter's arguments regarding the correlation between one of the law's stated purposes (the reduction in disorderly conduct and nuisances at clubs that serve alcohol) and the conduct it regulates (operating entertainment establishments) do not fall within this category of protections. Instead, Trotter's disagreement with the regulatory line drawn by the City and its fit to the City's stated aim is better explained as a challenge to the City's reasonable exercise of its police power. Accord *City of Baxter Springs v. Bryant*, 226 Kan. 383, 392, 598 P.2d 1051 (1979) (concluding a local law banning dancing in drinking establishments was unlawful

because it was not "reasonably calculated to promote the health, sanitation, morals, or general welfare of the residents").

"Municipalities have broad police powers to enact ordinances regulating or restricting certain activities to promote the health, safety, and welfare of the public." *Huffman*, 54 Kan. App. 2d 693, Syl. ¶ 3. A city's regulatory choices will undoubtedly have some impact on a person's liberty or property, but it is not the role of the court to second-guess those decisions as long as they are reasonable. See *Lower*, 274 Kan. at 750. Indeed, "'restraints on judicial review have added force "where the [law-making body] must necessarily engage in a process of line-drawing."'" *Downtown Bar and Grill v. State*, 294 Kan. 188, 199, 273 P.3d 709 (2012) (quoting *Federal Communications Commission v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S. Ct. 2096, 124 L. Ed. 2d 211 [1993]). For this reason, "an exercise of the police power . . . will be valid if it bears a real and substantial relation to the public health, safety, morals or general welfare of the public, and if it is not unreasonable or arbitrary." *Lower*, 274 Kan. at 750.

The City's decision to regulate entertainment establishments generally, rather than establishments that sell alcohol, meets this standard. Contrary to Trotter's arguments on appeal, the Code's stated purpose is not limited to security issues arising in venues that serve alcohol. While those concerns are one reason provided for adopting the framework, the Code also indicates that entertainment establishments generally can lead to issues with "noise, disorderly conduct, assaults, and other similar problems." W.M.O. 3.30.010. And it states that its purpose is to "regulate the operation of all entertainment establishments so as to minimize the negative effects and to preserve the public safety, health[,] and welfare" by, among other things, "making adequate provisions for security and crowd control to minimize disturbances." W.M.O. 3.30.010. The licensing requirements dovetail with these purposes, regulating entertainment establishments' capacity, times of operation, security, and safety protocols. There is no question the

entertainment-establishment licensing framework bears a real and substantial relationship to the City's interest in protecting public health, safety, and welfare.

> 1.3. *Trotter does not have standing to challenge the constitutionality of individual licensing requirements, as he never applied for an entertainment-establishment license.*

As part of its entertainment-establishment licensing framework, the Code requires an applicant to file a statement agreeing to allow inspections by "any member of the Police Department or Fire Department" and any other code enforcers or health officers. W.M.O. 3.30.080(b)(10). Failure to provide this consent is one of the grounds listed as justifying an application's denial. W.M.O. 3.30.080(c)(5). And refusal to allow an officer into a licensed establishment constitutes grounds for license revocation. W.M.O. 3.30.090(a)(7); W.M.O. 3.30.130. In his final constitutional challenge in this appeal, Trotter argues these provisions unconstitutionally require applicants to waive their Fourth Amendment rights to be free from unreasonable searches and seizures in order to obtain a license.

Trotter's claim faces an uphill road. Licensing frameworks routinely require their licensees to submit to inspections of the licensed premises. See *Siple v. City of Topeka*, 235 Kan. 167, 172, 679 P.2d 190 (1984) ("Kansas statutes contain infinite requirements for inspections in addition to building inspections."). These inspection requirements seek to "determine whether property complies with or violates any law or regulation of the governmental entity or if the property constitutes a hazard to public health or safety." 235 Kan. at 172. Thus, "the enactment and enforcement of inspection laws are within the police power of the state" or municipality. 235 Kan. 167, Syl. ¶ 3; see also *City of Overland Park v. Niewald*, 258 Kan. 679, 686-87, 907 P.2d 885 (1995) (quoting and applying *Siple*). And Kansas courts have long recognized that a person who applies for a license consents to inspections, thereby waiving his or her Fourth Amendment rights. See *Niewald*, 258 Kan. at 686; see also *Marcotte v. Kansas Animal Health Dep't*, No. 90,311,

2004 WL 235470, at *6 (Kan. App.) (unpublished opinion) (finding a person with an animal-facility license consented to inspections as a condition of applying for that license and "[c]onsent is one of the exceptions to the Fourth Amendment search warrant requirement"), *rev. denied* 278 Kan. 846 (2004).

But Trotter's final constitutional claim fails for a more fundamental reason: Trotter never applied for an entertainment-establishment license. He was never subject to the regulatory investigations he now challenges and has no standing to contest the reasonableness of those regulatory requirements. See *Creecy v. Kansas Department of Revenue*, 310 Kan. 454, 461, 447 P.3d 959 (2019) (standing requires a person to "'show a cognizable injury and establish a causal connection between the injury and the challenged conduct'"). Any decision we might render regarding the Code's inspection requirements would have no impact on Trotter's conviction for operating an entertainment establishment without a license.

A party who lacks standing requests an advisory opinion, which is beyond our jurisdiction to render. 310 Kan. at 460. Accord *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 283-84, 121 S. Ct. 743, 148 L. Ed. 2d 757 (2001) (declining to reach challenge to city's licensing framework for sellers of sexually explicit materials when business "neither now pursues nor currently expresses an intent to pursue a license under Waukesha law"). Thus, we do not reach the merits of Trotter's challenge to the licensing framework's inspection requirements.

Trotter has not shown a constitutional defect in Wichita's entertainment-establishment licensing framework, either on its face or as applied to him. We now turn to his claims of error relating to his trial and conviction for operating an unlicensed establishment in violation of those Code provisions.

24

2. *Trotter received a fair trial.*

Apart from his constitutional challenges, Trotter asserts numerous allegations of error with regard to his jury trial. He challenges the sufficiency of the evidence presented and claims that the prosecutor misstated the law during closing argument. He also asserts the district court abused its discretion in the manner it responded to a question from the jury during deliberations. Trotter claims that these incidents—individually or in combination—deprived him of a fair trial. For the reasons we discuss, we find no error and affirm the jury's verdict.

2.1. *There was sufficient evidence to support the jury's finding that Trotter was operating an entertainment establishment without a license.*

The City charged Trotter with operating an entertainment establishment without a license. As such, the City was required to prove (1) that Trotter was responsible for the establishment in question; (2) that the establishment was an "entertainment establishment" within the meaning of W.M.O. 3.30.020; and (3) that Trotter was operating the establishment without a license. Consistent with the Code, the district court instructed the jury that an entertainment establishment is "any event center or any person or entity which provides entertainment." See W.M.O. 3.30.020 (defining "entertainment establishment" in similar terms). The court also instructed the jury that entertainment included

> "any single event, a series of events, or an ongoing activity or business, occurring alone or as part of another business, to which the public is invited or allowed to watch or listen to the presentation of music played on sound equipment operated by an agent or contractor of the establishment, commonly known as a 'disc jockey' or 'DJ.'"

See W.M.O. 3.30.020 (defining "entertainment").

25

On appeal, Trotter does not contest the evidence to show he was responsible for the establishment known as The Association or People's Association. Nor does he claim that his establishment was licensed. Instead, he argues that the evidence presented at trial failed to prove that The Association provided "entertainment" within the meaning of the court's instruction in two respects. First, he claims the City failed to show the club was open to the public. Second, he reads the court's instruction to require proof that the person operating the sound equipment—who identified himself to police as the DJ—was his "agent"; he asserts the State did not make this showing. We disagree on both points.

When a defendant challenges the sufficiency of the evidence in a criminal case, we review the entire record in a light most favorable to the charging authority—here, the City—and ask whether we are convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). For the evidence to be sufficient, "there must be evidence supporting each element of [the] crime." *State v. Kettler*, 299 Kan. 448, 471, 325 P.3d 1075 (2014). We do not reweigh evidence, resolve evidentiary conflicts, or make determinations about the credibility of witnesses. *Chandler*, 307 Kan. at 668; *State v. Lloyd*, 299 Kan. 620, 632, 325 P.3d 1122 (2014).

Turning to Trotter's first sufficiency argument, we have no trouble concluding there was sufficient evidence before the jury that Trotter's club was open to the public. Evidence was presented regarding the Facebook post found by Wichita police officers announcing the club's opening. When officers executed their search warrant at the club, they found a paper stating patrons were required to pay $10—a minimal fee, little different from a bar's cover charge—as a "membership fee" to enter. There was no indication on this sheet, or on the Facebook announcement, that membership was restricted to certain individuals; anyone could presumably become a member and access the establishment. And as the City points out in its brief, the existence of a membership fee—a practice common in many businesses, such as warehouse clubs—does not mean a

business is not open to the public. The fact that the jury may have heard other conflicting evidence (such as Trotter's statement to the police that he was operating a 200-member private club) does not allow us to reweigh the evidence before the jury or obviate the evidentiary support for its verdict.

Trotter's claim regarding the DJ is similarly without merit. Trotter's reading of the court's instruction and his attempt to inject principles of agency law and fiduciary relationships are wide of the mark. Though perhaps laborious in its wording, the district court instructed the jury that it must find that the club allowed patrons to listen to music played on sound equipment by a DJ hired by the club, whether as an agent (such as an employee) or as a contractor—in contrast, for example, to music that might be played by an individual patron without the club's knowledge or consent. Again, there was ample evidence supporting this element. Most notably, when the police searched Trotter's establishment, a man identified himself to the officers as the club's DJ. From these statements, the jury could reasonably infer that the DJ was there at the club's request.

There was sufficient evidence to support the jury's verdict.

2.2.    *The prosecutor did not misstate the law during closing arguments.*

Akin to his sufficiency-of-the-evidence claims, Trotter asserts that the prosecutor misstated the law during closing argument while arguing what it meant to be open to the public and an agent or contractor of the club. Trotter did not object to the prosecutor's statements during closing argument, but claims of prosecutorial error during nonevidentiary phases of trial do not require a contemporaneous objection. *State v. Roeder*, 300 Kan. 901, 932, 336 P.3d 831 (2014).

Our prosecutorial-error analysis aims to ensure the government has not deprived the defendant of the right to a fair trial. See *State v. Sherman*, 305 Kan. 88, Syl. ¶¶ 1, 7,

27

378 P.3d 1060 (2016). We first examine the comments at issue to determine whether they are erroneous—that is, whether they fall outside the wide latitude prosecutors are afforded in arguing the case and obtaining a conviction. 305 Kan. 88, Syl. ¶¶ 6, 7. In the case of error, we then consider whether the error affected the outcome in light of all the evidence, thus depriving the defendant of a fair trial. 305 Kan. 88, Syl. ¶¶ 6, 7, 8. In a case involving the violation of a municipal ordinance, the City must show beyond a reasonable doubt that any error was harmless. See 305 Kan. 88, Syl. ¶ 8.

Turning first to the question of what it means to be open to the public under the ordinance, the City's prosecutor argued:

> "One part of this definition talks about whether the public is invited to watch. So when you call yourself a private organization, what does that mean is the public allowed? *The City's argument is either you're a private home or you're public.* If you go to Dillons, it's owned by private people and they can kick you out any time they don't want you to shop at Dillons, but it's still a place the public goes.
>
> "If you go to—someone referred to the Sam's Club in Wichita. You have to have a membership to go to the Candle Club. It's over on the east side of town. You can buy a membership. It's not private. But it is private in the sense that you have to pay for the ability to go into the Candle Club. The City's argument is it's still a public place. It's still a restaurant.
>
> "We know that in this case, whether or not they let customers in yet or not, we know that there were several people working on that night. We heard seven to nine people. *That is the public. They don't live there. This is not a private residence. So the fact that they were listening to the DJ alone proves that it's a public venue.*" (Emphases added.)

Trotter argues that these statements provide too expansive a view as to what is public or private. But we disagree. Although the Code governing entertainment establishments defines numerous terms, it includes no definition for what is meant by the term "public." Rather, whether something is public or private tends to be a question of

28

human experience—that is, a question of fact. We conclude that the prosecutor's comments regarding what is public or private conduct, considered in context, were a permissible discussion of the contours of that question.

We similarly find no error in the prosecutor's discussion of the DJ's relationship with the club. Trotter contends the prosecutor in rebuttal misconstrued what the jury needed to find when determining whether the DJ was an "agent or contractor" of the club. Trotter had already discussed this question in his closing argument, arguing a restrictive view of the "agency or contractor" language:

> "The City has chosen to define [entertainment] very specifically. It's an agent or a contractor. So someone's friend wouldn't count. A relative wouldn't count. It has to be someone who is an agent or a contractor. [The City] simply either missed that in [its] presentation or didn't have that. But, ladies and gentlemen, you can't guess over that. That is an actual element that you have to find, and so when you go back there you'll have to say beyond a reasonable doubt this person was an agent or a contractor, not just a DJ, and I don't think [the City has] done that."

The prosecutor disputed Trotter's assertions on rebuttal, arguing:

> "First I want to discuss this notion of an agent. What is an agent when we're talking about the disc jockey, the DJ? *An agent is just not the owner, not the person responsible.*
> "You get to use your common sense when you're determining what words mean, and the word agent just means the employee of, the person who's working. That would be an agent. So when you have Mr. Trotter, who says he owns the place, he runs the place, and you have two guys sitting behind the DJ booth, it doesn't matter if their name is Bob or Tom. *They're an agent because they're not Mr. Trotter.*" (Emphases added.)

On appeal, Trotter attempts to construe the prosecutor's comments as meaning any person who is not the owner. But his assertion takes the prosecutor's argument out of context. Taken as a whole, the prosecutor was distinguishing an employee of the

29

establishment—that is, a person the law acknowledges as an agent of the business—from Trotter himself. Nor did the prosecutor's discussion of Trotter's "agent" argument in any way alter the court's instruction regarding the elements of the charged offense.

Prosecutors are not permitted to misstate the law. *State v. Becker*, 311 Kan. 176, 182, 459 P.3d 173 (2020). But we do not find that the prosecutor did so here. The prosecutor's challenged statements were fair arguments discussing the contours of contested facts and applying those facts to the law as described by the court's instructions to the jury. These comments were within the permissible scope of argument. Trotter has not shown prosecutorial error.

2.3. *The court did not abuse its discretion in responding to the jury's question.*

During deliberations, the jury submitted a written question to the court, which read: "Does a private member club require an entertainment establishment license?" When the court consulted with the parties regarding this inquiry, Trotter originally asked the court to answer, "no"; the City asked that the court respond affirmatively, noting that unlike liquor licenses, private clubs are not exempted from the entertainment-establishment framework. After some discussion of these arguments, the parties agreed that the court should merely respond by instructing the jurors that they had received their instructions. The court did so. Trotter now claims that the response the court gave (and the parties agreed to)—"The Court has given you all of the instructions."—was an abuse of discretion.

An appellate court reviews a district court's response to a mid-deliberation jury question for an abuse of discretion. *State v. Lewis*, 299 Kan. 828, 856, 326 P.3d 387 (2014). That is, we afford the district court deference in determining which legally appropriate response to provide. We will only find error when no reasonable person would agree with the district court's position. 299 Kan. at 856.

30

Even though the parties and the court agreed on the court's response to the jury's question at trial, Trotter now argues the court had an obligation under K.S.A. 2019 Supp. 22-3420(d) to respond more substantively to the jury's question. We disagree. That statute merely sets forth the procedure for responding to a jury's question during deliberations—requiring the court to notify the parties of the question and discuss how best to respond. The court did that here. Nothing in the statutory language or our caselaw demands that the court provide a more specific response.

Indeed, the circumstances of this case demonstrate the wisdom of the court's answer. The parties took divergent views throughout the trial regarding what it meant to be an establishment "to which the public is invited or allowed to watch or listen to the presentation of music." The jury's question—whether a private club needed a license—touched on that subject, but it also had the potential to confuse the jury as to the element the State was required to prove. Directing the jury generally to the instructions they had been given reinforced the jury's role in applying the law, as instructed, to the evidence they heard at trial. The court's response was eminently reasonable.

2.4. *Because he has not shown any trial errors, Trotter's assertion of cumulative error necessarily fails.*

In his final argument on appeal, Trotter argues that if any of his allegations do not individually require reversal, a cumulation of errors deprived him of a fair trial. But Trotter has not apprised us of any error that occurred in his trial. Thus, his claim of cumulative error also fails. See *State v. Marshall*, 303 Kan. 438, 451, 362 P.3d 587 (2015).

Affirmed.